ORIGINAL



1  Brian S. Kabateck, SBN 152054
     (bsk@kbklawyers.com)
2  Richard L. Kellner, SBN 141416
     (rlk@kbklawyers.com)
3  KABATECK BROWN KELLNER LLP
   644 South Figueroa Street
4  Los Angeles, California 90017
   (213) 217-5000 (tel) /  (213) 217-5010 (fax)
5
   Berj Boyajian, SBN 60631
6    (berj@boyajianfirm.com)
   BOYAJIAN & ASSOCIATES
7  900 Wilshire Boulevard, Suite 721
   Los Angeles, California 90017
8   (213) 689-4423 (tel) / (213) 689-4421 (fax)
9  Mark J. Geragos, SBN 108325
     (mark@geragos.com)
10 Shelly Kaufman, SBN 100696
     (kaufman@geragos.com)
11 GERAGOS & GERAGOS APC
   644 South Figueroa Street
12 Los Angeles, California 90017
    (213) 625-3900 (tel) / (213) 625-1600 (fax)
13
   Ara Jabagchourian, SBN 205777
14  (ajabagchourian@cpmlegal.com)
   COTCHETT, PITRE & MCCARTHY
15 San Francisco Airport Office Center
   840 Malcolm Road, Suite 200
16 Burlingame, California  94010
   (650) 697-6000 (tel) / (650) 697-0577 (fax)
17
   Attorneys for Plaintiffs and
18 the Proposed Class

19
                    UNITED STATES DISTRICT COURT
20                  CENTRAL DISTRICT OF CALIFORNIA

21 Garbis Davoyan and Hrayr Turabian;        Case No.  CV10 5636 CBM   SSx
   individually on behalf of all others
22 similarly situated,                       CLASS ACTION COMPLAINT FOR:
23
                           Plaintiffs,       1. CONSTRUCTIVE TRUST
24                                           2. BREACH OF STATUTORY
        vs.                                     TRUST
25                                           3. UNJUST ENRICHMENT
   REPUBLIC OF TURKEY; THE                   4. AN ACCOUNTING
26 CENTRAL BANK OF THE REPUBLIC              5. HUMAN RIGHTS VIOLATIONS
   OF TURKEY; T.C. ZIRAAT                       AND VIOLATIONS OF
27 BANKASI;                                     INTERNATIONAL LAW
28                         Defendants.       JURY TRIAL DEMANDED

                           CLASS ACTION COMPLAINT

Plaintiffs Garbis Davoyan and Hrayr Turabian ("Plaintiffs") allege as follows:

## NATURE OF THE ACTION

1.     This is a civil action on behalf of the named Plaintiffs and a class of all Armenians and former Turkish citizens (and their heirs, beneficiaries and assigns), who were deprived of their citizenship, brutally deported, had their property seized and expropriated by the Turkish government whose successor is Defendant, Republic Of Turkey, (hereinafter, "ROT"), which continued the policies of its predecessor government.  By its own statutes and treaties, ROT is the legitimate successor responsible for its predecessor government(s) under the Ottoman Empire.  At all times mentioned in this complaint the actions and responsibilities of Defendant ROT include those actions and responsibilities of its predecessor governments under the Ottoman Empire.

2.     This is an action seeking redress under the laws of the United States of America for ROT's illegal course of conduct.  The ROT and its predecessor government, after deporting against their will and exterminating hundreds of thousands of Armenians, confiscated, sold and have derived income from real and personal property owned by persons of Armenian ethnicity and their heirs who are plaintiffs in this lawsuit. Specifically this action seeks the recovery of moneys wrongfully received and deposited in the ROT treasury, government agencies and other organizations of the ROT and its predecessor government. The losses occasioned by the ROT's wrongful acts and crimes include but are not limited to (1) the confiscation and disposal of land, buildings, businesses and other personal property owned by the Armenians; and (2) the income (e.g., rents) generated from land, buildings and businesses owned by the Armenians and located in the ROT.  Bank deposits and movable properties included priceless religious and other artifacts owned by the Plaintiffs, some of which are housed in museums in the ROT.  Despite the denials of the ROT, additional evidence of the participation of the ROT and its predecessor governments in the wrongful confiscation and continued wrongful withholding of the Plaintiffs' property has recently come to light.

1    3.    Plaintiffs seek an accounting, disgorgement and constructive trust of profits

2    which have been and are still being made by the ROT and its agencies and

3    instrumentalities which are engaged in commercial activities in the United States of

4    America.

5                    **PARTIES AND JURISDICTION**

6    4.    This Court has subject matter jurisdiction under the FSIA, specifically, 28

7    U.S.C. § 1605(a)(3).  Pursuant to the FSIA, if the Court has subject-matter jurisdiction, it

8    also has personal jurisdiction over the defendant foreign sovereign.  The acts complained

9    of in this complaint continue to the present, and although some of the acts complained of

10   in this complaint occurred prior to the time when the exceptions to sovereign immunity

11   were adopted, the ROT could not have expected immunity for its acts prior to that time.

12   5.    The Court has jurisdiction under 28 U.S.C. § 1330.

13   6.    The ROT is a nation whose agencies largely control and own many of the

14   instrumentalities of the economy including, Defendant The Central Bank Of The

15   Republic Of Turkey (hereinafter, "Central Bank") which owns many properties and

16   investments in the United States of America and T.C. Ziraat Bankasi ("Ziraat") which has

17   been operating in the United States since the 19th Century.

18   7.    The Central Bank is the successor in interest to the Imperial Ottoman Bank.

19   The State Treasury of the Ottoman Empire and the Imperial Bank, knowingly received

20   money and properties confiscated from the Plaintiffs and received deposits from Ziraat.

21   8.    The ROT extended the privileged operations of the Central Bank following

22   the end of the Ottoman Empire and has expanded its role as a central bank and as an arm

23   of the treasury to the present.

24   9.    The agencies of the ROT, including the Central Bank, were and continue to

25   be the recipient of moneys and properties and properties exchanged for properties

26   wrongfully confiscated and extorted from Plaintiffs.  The Central Bank has offices in

27   New York, and does commercial and investment business throughout the United States.

28

**CLASS ACTION COMPLAINT**

10.     The illicit money confiscated from the Plaintiffs are used and distributed by the ROT to its agencies of the ROT, including the Central Bank, agencies operating and controlling the Turkish National Airline which provides service to the United States. The ROT and the Central Bank distribute money to the Ministry of Tourism which operates tourist offices in New York, Washington D.C. and Los Angeles.

11.     These illicit moneys and properties are used to purchase substantial assets in the United States of America. Due to the relative and large returns which markets in the United States provide, the ROT has acquired substantial assets in the United States stock market and various other direct investments in businesses throughout the nation.

12.     The ROT largely owns and controls many businesses doing business in the United States of America, such as, the national airline of Turkey, *Turkish Airlines*, which is owned and administered by the State Airlines Administration of the ROT and the TC Privatization Administration. The Turkish National Airline flies into and serves cities in the United States.

13.     Plaintiffs' predecessors were subjected to a systematic and brutal extermination and confiscation of their property with the resulting property losses complained of in this action. This expatriation was accomplished by, among other things, murder, starvation and forced marches by which the Plaintiffs' predecessors were driven from their homes and deported. These criminal acts which Turkey committed, conspired to commit, and aided and abetted others to commit were crimes against peace, were war crimes and crimes against humanity.

14.     Plaintiff Garbis Davoyan is a resident of the County of Los Angeles, State of California, within this judicial district.

15.     Plaintiff Hrayr Turabian is a resident of the County of Queens, State of New York.

16.     Defendant Central Bank is a privileged joint-stock company largely owned and controlled by the ROT. The bank has 25 domestic branches, as well as branches in New York. The Central Bank's deposits include the treasury of the ROT which include

**CLASS ACTION COMPLAINT**

1 moneys gained and deposited by the ROT from the illegal and criminal confiscation of

2 the Plaintiffs' properties. The Central Bank is the knowing recipient of the ill-gotten

3 funds and properties complained of in this complaint. The Central Bank owns property

4 or property exchanged for property illegally and criminally confiscated by the ROT.

5      17.    Defendant Ziraat is Turkey's largest and oldest bank, with its origins dating

6 back to the 1860s. Ziraat was a state institution and since 1924 is a joint stock company

7 in which the Treasury of the ROT is the sole shareholder. It played an instrumental role

8 in confiscating and disposing of Armenian properties. It is a "leading player in Turkey's

9 money and capital markets." Ziraat has dozens of locations with branches worldwide

10 including in New York.

11      18.    ROT and its banking institutions and other commercial associations doing

12 and affecting business in the United States of America are the recipients of funds

13 wrongfully belonging to Plaintiffs, members of the representative class and their heirs,

14 beneficiaries and assigns. The profits which the ROT has incurred as a result of their

15 plunder of Plaintiffs' property have impacted ROT's commercial transactions in the

16 United States.

17      19.    ROT and their agents have wrongfully obtained, accepted, concealed and

18 converted the profits from the assets wrongfully confiscated from the Plaintiffs by means

19 of crimes against humanity for their own use and have assisted others in the perpetration

20 of the extermination of the Armenian people and the wrongful confiscation of the

21 Plaintiffs property.

22      20.    The ROT has wrongfully withheld and directed the withholding of registry-

23 books which document the confiscation, conversion and wrongful holding of the

24 Plaintiffs' properties without compensation.

25      21.    At all times relevant to this lawsuit, the ROT is a foreign sovereign as

26 defined under the Foreign Sovereigns Immunities Act (FSIA).

27      22.    Venue is proper in this Court because instrumentalities of the ROT are

28 "doing Business" within this district pursuant to 28 U.S.C. Section 1391(f).

# PRELIMINARY ALLEGATIONS

23.     In 1914, before World War I, there were an estimated two million Armenians in the Ottoman Empire.  While the Armenian population in Eastern Anatolia (also called Western Armenia) was large and clustered, there were large numbers of Armenians in the western part of the Ottoman Empire.  These Armenians had lived in these areas for centuries and a great many were landowners and farmers.

24.     Until the late 19th century, the Armenians were referred to as *millet-i sadika* (loyal nation) by the Ottomans.  This meant that they were living in harmony with other ethnic groups and without any major conflict with the central authority.  The Christian Armenians were subject to laws which gave them fewer legal rights than fellow Muslim citizens.  However they also enjoyed privileges such as exemption from conscription into the army.  The Tanzimat (regulations) government gave more rights to the minorities in the middle of the 19th century.  However, the long ruling Sultan Hamid suspended the constitution early in his reign and ruled as he saw fit.  Despite pressure on the Sultan by the major European countries to treat the Christian minorities more gently, abuses only increased.

25.     The single event that started the chain is most likely the Russian victory over the Ottoman Empire in the War of 1877–78.  At the end of this war the Russians took control over a large part of Armenian territory (including the city of Kars).  The Russians claimed they were the protectors of Christians within the Ottoman Empire and now they were clearly militarily superior to the Ottomans.  The weakening control of the Ottoman government over its empire in the following 15 years led many Armenians (as well as Greeks, Romanians, Serbians and Balkans) to believe that they could gain independence.

26.     In 1894 a minor Armenian unrest in Bitlis Province was brutally suppressed.  Armenian communities were then attacked for the next three years.  According to most estimates, 80,000 to 300,000 Armenians were killed between 1894 and 1897.

27.     Just five years before World War I, the Ottoman Empire came under the control of the secular *Ittihad ve Terraki* ("Committee of Union and Progress", also known as "Young Turks"). Sultan Hamid was deposed and his younger brother Mehmed V was installed as a figurehead ruler. Real power, however, was held by Ismail Enver (Enver Pasha). At first some Armenian political organizations supported the Young Turks, in hopes that there would be a significant change for the better. Indeed, Armenians were elected to the newly restored Ottoman Parliament.

28.     While there was an official "special organization" founded in December 1911 by the Ottoman government, another governmental organization that participated in what led to the destruction of the Ottoman Armenian community was founded by the *Ittihad ve Terraki*. This organization technically appeared in July 1914 and was supposed to differ from the one already existing in one important point; mostly according to the military court, it was meant to be a "government in a government" (needing no orders to act).

29.     Later in 1914, the Ottoman government decided to influence the direction the special organization was to take by releasing criminals from prisons to be the central elements of this newly formed special organization. According to the Mazhar, commissions attached to the tribunal as soon as November 1914, and resulted in the release of 124 criminals from Pimian prison. Many other releases followed; in Ankara a few months later, 49 criminals were released from its central prison. Little by little from the end of 1914 to the beginning of 1915, hundreds, then thousands of prisoners were freed to form the members of this organization. Later, they were charged to escort the convoys of Armenian deportees. Vehib, commander of the Ottoman Third Army, called those members of the special organization, the "butchers of the human species."

30.     The organization was led by the Central Committee Members Doctor Nazim, Behaeddin, Atif Riza, and former Director of Public Security Aziz. The headquarters of Behaeddin were in Erzurum, from where he directed the forces of the

– 7 –

1    Eastern vilayets (districts).  Aziz, Atif and Nazim operated in Istanbul, and their decisions

2    were approved and implemented by Cevat, the Military Governor of Istanbul.

3         31.     On May 25, 1915 Talat Pasha (Minister of the Interior) issued orders for the

4    forced evacuation of hundreds of thousands – possibly over a million – Armenians from

5    across all of Anatolia (except parts of the western coast) to Mesopotamia and what is now

6    Syria.  Many went to the Syrian town of Dayr az-Zawr and the surrounding desert.

7         32.     The Ottoman government ordered the evacuation or deportation of many

8    Armenians living in Anatolia, Syria, and Mesopotamia.  In the city of Edessa (modern

9    Şanlıurfa) the local Armenian population, worried about their fate, revolted (early 1916)

10   against the Ottoman government and took control of the old city.  Ottoman forces

11   attacked the city and bombarded it with artillery but the Armenians resisted.  The German

12   General in command of the closest Ottoman army to the city, Baron von der Goltz,

13   arrived and negotiated a settlement with the Armenians.  In exchange for an Armenian

14   surrender and disarmament, the Ottoman government agreed not to deport them.

15   However, the Ottoman government broke the terms of the agreement and deported the

16   Armenians.

17        33.     On May 24, 1915 the Triple Entente warned the Ottoman Empire that: "In

18   the view of these...crimes of Turkey against humanity and civilization... the Allied

19   governments announce publicly... that they will hold personally responsible... all

20   members of the Ottoman government and those of their agents who are implicated in

21   such massacres."

22        34.     Following the Armistice of Mudros in January 1919, the preliminary Peace

23   Conference in Paris (Paris Peace Conference, 1919) established "The Commission on

24   Responsibilities and Sanctions" which was chaired by U.S. Secretary of State Lansing.

25   Following the commission's work, several articles were added to the treaty, and the acting

26   government of the Ottoman Empire, Sultan Mehmed VI and Damat Adil Ferit Pasha,

27   were summoned to trial. The Treaty of Sèvres gave recognition of the Democratic

28   Republic of Armenia and developed a mechanism to bring to trial the criminals of

CLASS ACTION COMPLAINT

"barbarous and illegitimate methods of warfare... [including] offenses against the laws and customs of war and the principles of humanity."

35.     Article 230 of the Treaty of Sèvres required the Ottoman Empire, "to hand over to the Allied Powers the persons whose surrender may be required by the latter as being responsible for the massacres committed during the continuance of the state of war on territory which formed part of the Ottoman Empire on August 1, 1914."

36.     At the Military Trials in Istanbul in 1919 many of those responsible for the genocide were sentenced to death in absentia, after having escaped trial in 1918.  It is believed that the accused succeeded in destroying the majority of the documents that could be used as evidence against them before they escaped.  Admiral Calthorpe, the British High Commissioner, described the destruction of documents: "Just before the Armistice, officials had been going to the archives department at night and making a clean sweep of most of the documents."

37.     The military court established the will of the CUP to eliminate the Armenians physically, via its special organization.  The Court Martial in1919 pronounced sentences as follows: "The Court Martial taking into consideration the above-named crimes declares, unanimously, the culpability as principal factors of these crimes the fugitives Talat Pasha, former Grand Vizir, Enver Efendi, former War Minister, struck off the register of the Imperial Army, Cemal Efendi, former Navy Minister, struck off too from the Imperial Army, and Dr. Nazim Efendi, former Minister of Education, members of the General Council of the Union & Progress, representing the moral person of that party;... the Court Martial pronounces, in accordance with said stipulations of the Law the death penalty against Talat, Enver, Cemal, and Dr. Nazim."

38.     Countries officially recognizing the Armenian genocide include Argentina, Armenia, Austria, Australia, Belgium, Canada, Cyprus, France, Germany, Greece, Italy, Lebanon, Lithuania, The Netherlands, Poland, Russia, Slovakia, Sweden, Switzerland, Uruguay, Vatican City and Venezuela.  The U.S. Congress and the State of California and most other states officially recognized the Armenian Genocide.

**CLASS ACTION COMPLAINT**

39.     ROT maintained its policy of deporting, persecuting and exterminating to finance its participation in World War I in order to perpetuate its persecution of subject peoples.  ROT collected the looted assets in central depositories and collected profits from the lands and businesses confiscated by them.  The assets were transferred to ROT's treasury then to the Central Bank, agencies and other organizations controlled by the ROT, many of which did and continue to do and affect business and commercial associations in the United States of America.

40.     More that one million Armenians were liquidated in forced marches, concentration camps and general massacres perpetrated, assisted and condoned by ROT's officials and armed forces all the while disingenuously and fraudulently alleging to maintain the fact and title to the property confiscated from the deported Armenians intact. In fact, ROT has withheld the property and any income derived from such property from Plaintiffs and the Class.

41.     When the ROT became the lawful government of Turkey, they adopted and accepted all of the rights and obligations of the previous government of the Ottoman Empire.

42.     Following the end of World War I, the policy of the ROT was to eradicate the remnants of the Ottoman Empire's Armenian population and finalize the expropriation of their public and private properties in order to benefit from the enormous wealth that had been expropriated by the Ottoman government, its agencies and authorized individuals.  The confiscations included, but are not limited to, businesses, Bank deposits, houses, churches, and vast amounts of land.  To the end of consolidating and further benefiting from these confiscations, the ROT took legislative and physical actions to confiscate even more properties than was done previously.  Thereby they reaped and continued to reap vast profits from the land and properties wrongfully confiscated by means of the genocide perpetrated on the Armenian people.

43.     While the ROT enacted laws whose purpose was allegedly to protect the property of the Plaintiffs, these laws were, in fact, a subterfuge to enable the ROT to

1    perpetrate and perpetuate the extermination, deportation and confiscation of the
2    Armenians and their property in violation of the law of nations.  In fact, these laws have
3    been and are systematically and deliberately ignored in order to perpetrate the
4    international crimes of the ROT.

5        44.    During the end of World War I, ROT adopted laws and regulations
6    governing "abandoned" property, real and personal, which provided that the ROT
7    government shall administer the property, collect rents and sale proceeds and deposit
8    such funds in the government Treasury in trust in the name of the owners of such
9    property.  The laws and regulations provided for the Treasury to hold such funds for the
10   benefit of the owners of such property and that such funds and property shall be restored
11   to the owners of said property.

12       45.    The ROT either complied with its own laws and regulations concerning its
13   obligation to administer the "abandoned" property, collect rents and sale proceeds and
14   deposit such funds in the government Treasury *in the name of the owners of such*
15   *property,* or it failed to comply.

16       46.    If ROT complied with its own laws and regulations, then the owners of
17   such "abandoned" property are entitled to an accounting from the ROT Treasury of the
18   moneys owed to them by the Treasury which the Treasury is holding *in their names* and
19   on their behalf in trust.

20       47.    If ROT failed to comply with its own laws and regulations and did not
21   deposit such funds in the Treasury *in the names of the owners*, then the "abandoned
22   property" funds have been comingled with the general ROT Treasury funds and all ROT
23   Treasury funds must be deemed to include Armenian "abandoned property" trust funds.
24   In such case, all transfers of funds from the ROT Treasury to financial institutions
25   included un-segregated Armenian "abandoned property" trust funds. This includes
26   financial transactions through the Central Bank of the Republic of Turkey, Ziraat
27   Bankasi, international banks and U.S. Banks.

28

**CLASS ACTION COMPLAINT**

48.     Despite the denials of the ROT, additional evidence of the participation of the ROT in the wrongful confiscation and continued wrongful withholding of the Plaintiffs' property has come to light.  The actions complained of herein against the ROT were contrary and in disregard of the laws ostensibly in force currently and at the time in the ROT and their predecessors, to protect the goods and properties of the Armenian minority.  These laws have been and are deliberately and willfully ignored all for the benefit of the ROT in order to maintain control of and benefit derived from the moneys wrongfully withheld and owed to the Armenians.

49.     The Class' demands for an accounting of the moneys owed to them by the ROT have been ignored. and, in fact, the ROT has publicly and emphatically denied the confiscation of the Armenian properties.  Plaintiffs have no redress in the ROT's courts and, in fact, would be subject to criminal prosecution in the ROT if they asserted their rights.  As stated above, criminal prosecutions under Article 301 of the ROT Penal Code which prohibits "insulting Turkishness."

## LEGAL AND EQUITABLE TOLLING

50.     Plaintiffs legal right to seek compensation for genocide, war crimes and crimes against humanity is preserved by the Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity (26 November 1968).  Accordingly, there are no statutory limitations on claims of war crimes, crimes against humanity or genocide.

51.     No statute of limitations has begun to run on the causes of action stated herein because Plaintiffs and the proposed Class were unable to make a claim for their lost income and have been denied access to vital information essential to pursue the stated claims as a result of ROT's fraudulent concealment of the misconduct, without any fault or want of diligence or due care on the part of Plaintiffs or the proposed Class.

52.     Evidence of the extent of ROT's wrongdoing has more fully come to light in recent years.

53.     Knowing that its behavior violated the laws of humanity and international law, at no time have Defendants made any reasonable attempt to compensate Plaintiffs and members of the Class for their injuries and losses.  In fact, ROT has wrongfully, disingenuously and deceitfully denied the fact of and their responsibility for their misconduct and crimes against humanity. Such failures estop ROT from interposing any time bar defense to these claims.

54.     Moreover, no statute of limitations has begun to run on the causes of action stated herein because Defendants' misconduct is continuing; Defendants have not made a reasonable attempt to disgorge their illicit profits or compensate their victims. Defendants have continued to reap profits as a result of their actions and have refused all requests for an accounting of the funds in wrongfully collected and held by them. Defendants are therefore estopped from interposing any type of time bar defense to these claims.

55.     CCP section 354.4 states:

            (a) The following definitions govern the construction of this section:

                    (1)     "Armenian Genocide victim" means any person of Armenian or other ancestry living in the Ottoman Empire during the period of 1915 to 1923, inclusive, who died, was deported, or escaped to avoid persecution during that period.

                    (2)     "Insurer" means an insurance provider doing business in the state, or whose contacts in the state satisfy the constitutional requirements for jurisdiction, that sold life, property, liability, health, annuities, dowry, educational, casualty, or any other insurance covering persons or property to persons in Europe or Asia at any time between 1875 and 1923.

(b) Notwithstanding any other provision of law, any Armenian Genocide victim, or heir or beneficiary of an Armenian Genocide victim, who resides in this state and has a claim arising out of an insurance policy or policies purchased or in effect in Europe or Asia between 1875 and 1923 from an insurer described in paragraph (2) of subdivision (a), may bring a legal action or may continue a pending legal action to recover on that claim in any court of competent jurisdiction in this state, which court shall be deemed the proper forum for that action until its completion or resolution.

(c) Any action, including any pending action brought by an Armenian Genocide victim or the heir or beneficiary of an Armenian Genocide victim, whether a resident or nonresident of this state, seeking benefits under the insurance policies issued or in effect between 1875 and 1923 shall not be dismissed for failure to comply with the applicable statute of limitation, provided the action is filed on or before December 31, 2010.

(d) The provisions of this section are severable. If any provision of this section or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

**CLASS ACTION COMPLAINT**

**ALLEGATIONS SPECIFIC TO REPRESENTATIVE PLAINTIFFS**

56.     Plaintiff Garbis Davoyan is the grandson of Davoudoglu Garouj Aga who owned property in the County of Aintab village of Doluk (Turkey).  Attached hereto as Exhibit A is a true and correct copy of the deed for property owned by Davoudoglu Garouj Aga.

57.     Plaintiff Hrayr Turabian is the grandson of Samouel Mardiguian who owned property in the District of Adana County of Adana (Turkey).  Attached hereto as Exhibit B is a true and correct copy of the deed for property owned by Samouel Mardiguian.

**CLASS ACTION ALLEGATIONS**

58.     Plaintiffs bring this action on behalf of themselves and a class of all others similarly situated (the "Class") defined as:

   a.     all persons of Armenian ethnicity (or if deceased, their heirs and assigns) who are residents of the United States;

      b.     who owned real property located in the ROT in 1915;

      c.     who were deported and relocated from Turkey between 1915 to 1923; and

      d.     whose real property in the ROT, after their relocation, was expropriated by the ROT for its use or for use by others.

59.     This action is brought as a class action pursuant to the provisions of Federal Rules of Civil Procedure, Rule 23.

60.     The exact number of the members of the class, as identified above, is not known to Plaintiffs, but it is estimated that members of the class number in the tens or hundreds of thousands and are so numerous that joinder of individual members herein is impracticable.  Due to the nature of the claim herein, the members of the Class are geographically dispersed throughout California and the United States.

**CLASS ACTION COMPLAINT**

1      61.    Plaintiffs' claims are typical of the claims of the Class that they seek to

2   represent.  Due to Defendants' illegal and unfair methods, acts and practices, Plaintiffs,

3   like Class members, were deprived of income and rent from their real property.

4   Plaintiffs, like members of the Class, sustained damages arising out of Defendants'

5   conduct in violation of international laws.

6      62.    Common questions of law and fact exist as to all members of the Class and

7   predominate over any questions affecting solely individual members of the Class.

8   Among the questions of law and fact common to the Class are:

9      (a)    Whether Defendants improperly retained income and rent derived from or

10   proceeds of the sale or disposal of the real property of the Plaintiff and Class;

11      (b)    Whether Defendants are deemed to be a constructive trustee of the real and

12   other property of Plaintiffs and Class in the ROT;

13      (c)    The duration and extent of any such wrongful conduct alleged herein;

14      (d)    The amount by which Defendants profited from their wrongful practices;

15      (e)    Whether, under common principles of constructive trust and unjust

16   enrichment, ROT unjustly enriched itself to the detriment of Plaintiff and the Class,

17   entitling Plaintiff and the Class to disgorgement of all rents and profits resulting there

18   from; and

19      (f)    Whether ROT's conduct caused injury to Plaintiffs and the Class and, if so,

20   the proper measure of damages.

21      63.    Plaintiffs are an adequate representative of the Class because its interests do

22   not conflict with the interests of the members of the Class it seeks to represent.  Plaintiffs

23   have retained counsel competent and experienced in complex class action and antitrust

24   litigation.  The interests of members of the Class will be fairly and adequately protected

25   by Plaintiffs and Plaintiffs' counsel.

26      64.    A class action is superior to other available means for the fair and efficient

27   adjudication of the claims of Plaintiffs and the Class.  The damages suffered by each

28   individual member of the Class are small given the burden and expense of individual

1   prosecution of the complex and extensive litigation necessitated by Defendants' conduct,
2   and it would be virtually impossible for Class members individually to redress effectively
3   the wrongs done to them.  Even if the members of the Class themselves could afford such
4   individual litigation, the court system could not.  Individualized litigation presents a
5   potential for inconsistent or contradictory judgments.  Individualized litigation increases
6   the delay and expense to all parties and the court system presented by the complex legal
7   and factual issues of the case.  By contrast, the class action device presents far fewer
8   management difficulties, and provides the benefits of single adjudication, economy of
9   scale, and comprehensive supervision by a single court.

10      65.    Plaintiffs' claims are typical of the claims of the other members of the
11   Class, since all such claims arise out of Defendants' actions or the actions of its agents,
12   which resulted in deaths, torture, assault, plunder and loss of Plaintiffs and their
13   ancestors' rightful property which gives Plaintiffs the right to the relief sought.

14      66.    Plaintiffs anticipate that there will be no difficulty in the management of
15   this litigation.  A class action is superior to other methods for fair and efficient
16   adjudication of the controversy.  Accordingly, Certification of the Plaintiffs class is
17   appropriate under Fed. R. Civ. P. 23(b)(1), (2) and/or (3).

18

19                       **FIRST CAUSE OF ACTION**
20                        **CONSTRUCTIVE TRUST**

21      67.    Plaintiffs reallege and incorporate by reference all the allegations of this
22   Complaint with the same force and effect as if fully restated herein.

23      68.    This is an action seeking equitable redress for ROT's illegal course of
24   conduct in taking as its own the income generated by Plaintiffs and the Class' real
25   property located in the ROT after the ROT relocated the Plaintiffs between 1915 and
26   1917, as well as, the proceeds from the sale of that property.  This action also seeks the
27   return of priceless religious and other objects seized by the ROT and Bank deposits.

28

69.     A constructive trust is an equitable remedial device by which a court adjudges specific restitution of a received benefit.  Constructive trusts may be imposed when a defendant has acquired legal title to property or money under such circumstances that he or she may not in good conscience retain the beneficial interest in the property, and in such a situation, equity converts the legal titleholder into a trustee holding the title for the benefit of those entitled to the ownership thereof.

70.     A constructive trust should be imposed for the purpose of preventing unjust enrichment by the defendants for the loss of use and the value of the use of the land.

71.     The ROT government will gain an unconscionable advantage in the retention of the income from the Plaintiffs' property if they do not pay the value of the use of this property.  A constructive trust should be imposed to prevent unjust enrichment.  It is against equitable principles to use the land without payment.

72.     Defendants have been enriched by not paying the value of the use of the land.  Plaintiffs (and their heirs and assigns), the owners of the real property, have lost the value of the stream of income from the property.  The value the defendants have gained from the unpaid use of the land is the same value plaintiffs have lost by nonpayment of this use.

## SECOND CAUSE OF ACTION
## BREACH OF STATUTORY TRUST

73.     Plaintiffs reallege and incorporate by reference all the allegations of this Complaint with the same force and effect as if fully restated herein.

74.     Laws enacted by the government of the Ottoman Empire and by their successor the ROT from 1915 to the present purported to hold for the benefit of the Armenians the property allegedly "abandoned" by them during the genocide.

75.     Following the orders of May 1915, which provided for the forced evacuation of the Armenians, regulations were enacted which purported to care for, and preserve the lands, goods and other property of the Armenian people.  The 34 articles in

1   the law, known as the "Abandoned Properties Law" these regulations provided, among
2   other things, that "the houses and all real properties belonging to the deported population,
3   including the items they contain, shall be closed and immediately put under seal by
4   employee authorized by the Administrative commissions and shall then be taken under
5   protection." (Article 2)

6       76.    The regulations of 1915 and other laws enacted between 1915 and 1924,
7   provided that the sale of any moveable or immovable property was to be remitted to the
8   Turkish treasury.  However, any monies received from the sale of "moveable" and
9   "immoveable" properties were to be "restored" to them.  This included land, buildings,
10  churches, businesses, et cetera, and/or the proceeds from their sale.

11      77.    The Treaties of Sevres and Lausanne signed by the ROT confirmed the
12  rights of the Armenian populations, as well as, additional laws enacted by the ROT
13  confirming the rights of the Armenian populations to the property seized and/or sold by
14  the ROT.

15      78.    These laws and regulations enacted by the ROT created a statutory trust for
16  the benefit of each of the Plaintiffs and their heirs to preserve and return the property
17  seized by the Ottoman government and later the ROT during and following World War I.
18  This trust created a fiduciary duty on the part of the ROT to preserve and to return the
19  rents, profits and/or the proceeds from the sale of properties owned by the Plaintiffs and
20  their heirs and assigns.  Defendants in failing to return the monies confiscated from the
21  Plaintiffs and to account for them have breached their fiduciary obligations created by
22  their statutes.

23      79.    In breach of their fiduciary duties, Defendants have refused to honor, return
24  the moneys, moveable properties or account for them, despite the requests of the
25  Plaintiffs.  As a result the Plaintiffs have: lost income from the rents on their properties;
26  lost use of their properties; lost profits from their businesses; lost proceeds from disposal
27  of their properties; and loss of their moveable goods and deposits, all to their damage and
28  detriment.

CLASS ACTION COMPLAINT

80.    Defendant's refusal to enforce and honor the trusts has wrongfully enriched them in breach of their fiduciary duties and has enabled them to wrongfully profit from the property which is held by them in trust for the Plaintiffs.

## THIRD CAUSE OF ACTION
### UNJUST ENRICHMENT

81.    Plaintiffs reallege and incorporate herein, as though fully set forth, the allegations of all preceding paragraphs of the Complaint.

82.    Defendants have wrongfully confiscated, received and is withholding property, rents and profits which rightfully belong to Plaintiffs and the members of the Class.

83.    Defendants have not filed any accounting to account for and/or pay to Plaintiff the value of the rents and profits derived therefrom.

84.    As a result of Defendants' wrongful acts and omissions, Defendants have been unjustly enriched to the detriment of Plaintiff.

85.    Plaintiff therefore demands restitution and judgment against Defendants in an amount to be determined at trial, together with interest, attorneys' fees, and the costs of this action.

## FOURTH CAUSE OF ACTION
### ACCOUNTING

86.    Plaintiffs reallege and incorporate herein, as though full set forth, the allegations of all preceding paragraphs of the Complaint.

87.    ROT has never accounted for the rents and profits received by them or their agents and assigns which were and continue to be wrongfully taken from the Plaintiff.

88.    As a result of the wrongful taking of the property of the Plaintiffs and the rents and profits therefrom, Plaintiffs have been unable to use or invest those rents and profits.

**CLASS ACTION COMPLAINT**

89.     As a result of ROT's aforesaid wrongful acts and omissions, Plaintiffs have been injured and damaged and demand the equitable remedy of accounting.

## FIFTH CAUSE OF ACTION
## HUMAN RIGHTS VIOLATIONS AND
## VIOLATIONS OF INTERNATIONAL LAW

90.     Plaintiff realleges and incorporates herein, as though fully set forth, the allegations of all preceding paragraphs of the Complaint.

91.     Defendant ROT directed and participated in a deliberate plan of forced deportation, confiscation and extermination in furtherance of the commission of war crimes, crimes against humanity, crimes against peace, torture, rape, starvation, physical and mental abuse, summary execution and genocide.

92.     Defendant ROT knowingly facilitated, directed, financed, ratified, participated in and abetted the activities of war criminals that used torture, starvation, forced marches to obtain victims possessions, lands and belongings.  The ROT facilitated and obstructed the prosecution of war criminals who had engaged in the crimes previously alleged herein.

93.     ROT committed war crimes, crimes against peace and crimes against humanity, which violate the laws of the ROT and the laws international treaties and customary international enforceable in the Court as federal common law and the law of nations by purposeful and intentional obstruction of justice.

94.     ROT's actions violated international treaties and customary international law, a law which "results from a general and consistent practice of states followed by them form a sense of legal obligation."  Restatement (Third) of the Foreign Relations Law of the United States, Section 102 (2)(1987).  Plaintiffs further cite the Genocide Convention, the 1919 Paris commission on Responsibility of Authors of the War; the Treaties of Sevres and Lausanne; the United Nations Charter; the Universal Declaration of Human Rights; the Geneva Convention of 1929; the supplemental General Convention

1    of the Treatment of non-Combatants During World War Time; the principles of

2    customary international law recognized by the Nuremberg Tribunals; the Covenant on

3    Civil and Political Rights; and the Hague convention of 1907.

4

5                              **PRAYER FOR RELIEF**

6        WHEREFORE, Plaintiffs and the Class pray for judgment against Defendants as

7    follows:

8        1.      Certifying this action as a Class action, certifying Plaintiffs as

9    representatives of the Class and designating Plaintiffs' counsel as counsel for the Class;

10       2.      Declare that the profits, rents and property illegally confiscated, controlled

11   and disposed of by the Defendants were obtained through systematic persecution,

12   extermination, deportation, torture, force and murder violated international treaties and

13   customary international law enforceable in this Court as federal common law, the law of

14   nations and international law;

15       3.      Declaring Defendants liable under the common law of unjust enrichment;

16       4.      Order Defendants to make available all information relating to the

17   confiscation and disposal of property and profits owned by Plaintiffs and the Class in

18   order that an accounting of assets and profits may be realized;

19       5.      Award Plaintiffs and the Class the current value of any profits so accounted

20   for, plus interest compounded annually since May 15, 1915;

21       6.      Award Plaintiffs and the Class compensatory damages arising out of

22   Defendants' unlawful behavior in trafficking in, retaining and disposing of profits from

23   the properties wrongfully confiscated from Plaintiffs and the Class;

24       7.      Order Defendants to disgorge any profits earned by trafficking in, disposing

25   of or obtained from the use or benefits obtained from the properties wrongfully

26   confiscated from the Plaintiffs and the Class;

27       8.      Entering judgment in favor of Plaintiffs and the Class against Defendants

28   on all Causes of Action;

**CLASS ACTION COMPLAINT**

1       9.    Grant Plaintiffs and the Class equitable relief in the nature of disgorgement,

2   and restitution, and creating a construction trust to remedy Defendants' unjust

3   enrichment;

4       10.    Grant Plaintiffs and the Class the costs of prosecuting this action, together

5   with interest and reasonable attorneys' fees and costs; and

6       11.    Grant such other relief as this Court may deem just and proper.

7

8   Dated: July 28, 2010        **KABATICK BROWN KELLNER LLP**

9

10          By: _____

11             Brian S. Kabateck
           Richard L. Kellner

12          **BOYAJIAN & ASSOCIATES**
        Berj Boyajian

13

14          **GERAGOS & GERAGOS APC**
        Mark J. Geragos

15          Shelly Kaufman

16          **COTCHETT, PITRE & MCCARTHY**

17          Ara Jabagchourian

18          *Attorneys for Plaintiffs and the Proposed Class*

19

20

21

22

23

24

25

26

27

28

1
**JURY TRIAL DEMAND**

2
Plaintiffs and the Class hereby demand a jury trial on all claims for relief.

3

4
Dated: July 28, 2010                          **KABATECK BROWN KELLNER LLP**

5

6
By: _____

7
Brian S. Kabateck
Richard L. Kellner

8
**BOYAJIAN & ASSOCIATES**

9
Berj Boyajian

10
**GERAGOS & GERAGOS APC**

11
Mark J. Geragos
Shelly Kaufman

12
**COTCHETT, PITRE & MCCARTHY**

13
Ara Jabagchourian

14
*Attorneys for Plaintiffs and the Proposed Class*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

– 24 –
**CLASS ACTION COMPLAINT**